Mr. Justice BRADLEY, with whom concurred Mr. Justice SWAYNE,
dissenting.
I dissent from the opinion of the court in this case for the following reasons:
The civil rights bill (passed April 9th, 1866, and under which the indictment in this case was found and prosecuted) ■was primarily intended to carry out, in all its length and breadth, and to all its legitimate consequences, the then recent constitutional amendment abolishing slavery in the United States, and to place persons of African descent on an equality of rights and privileges with other citizens of the United States. To do this effectually it was not only neces *596 sary to declare this equality and impose penalties for its violation, but, as far as practicable, to counteract those unjust and discriminating laws of some of the States by which persons of African descent were subjected to punishments of peculiar harshness and ignominy, and deprived of rights and privileges enjoyed by white citizens.
This general scope and object of the act will often furnish us a clue to its just construction. It may be remarked, however, that the terms of the act are broad enough to embrace other persons as well as those of African descent, but that is a point not now in question in this case.
The first section declares that all persons born in the United States, not subject to a foreign power, and not including untaxed Indians, are citizens of the United States, and that such citizens, of every race and color, without regard to previous condition of slavery, shall have the same right, in every State and Territory iu the United States, to make and enforce contracts; to sue, be parties, and give evidence; to inherit, purchase, lease, sell, hold, and convey real and personal property, and to the full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law or custom to the contrary notwithstanding.
This is the fundamental section of the act. All that follows is intended to secure and vindicate, to the objects of it, the rights herein declared, and to establish the requisite machinery for that end.
This section is in direct conflict with those State laws which forbade a free colored person to remove to or pass through the State, from having firearms, from exercising the functions of a minister of the gospel, and from keeping a house of entertainment; laws which prohibited all colored persons from being taught to read and write, from holding or conveying property, and from being witnesses in any case where a white person was concerned; and laws which subjected them to cruel and ignominious punishments not imposed upon white persons, such as to be sold as vagrants, to *597 be tied to the whipping-post, &c., &c. All these, and all other discriminations, were intended to be abolished and done away with.
The second section makes it a misdemeanor, punishable by fine or imprisonment, for any person, under color of any law or custom, to deprive any inhabitant of a State or Territory of any right secured by the act, or to subject him to different punishment or penalties on account of his having been a slave, or by reason of his color or race, than is prescribed for the punishment of white persons.
The third section proceeds to confer upon the District Courts of the United States, exclusive of the State courts, jurisdiction to try these offences, and then follows the clause under which the indictment in the present case was found, declaring that the said District Courts shall also have cognizance, concurrently with the Circuit Courts of the United States, “of all causes, civil and criminal, affecting persons who are denied, or cannot enforce in the courts or judicial tribunals of the State, or locality where they may be, any of the rights secured to them by the first section,” with right of removal of causes from State courts, &c. It is evident that the provisions of the second section, making it a criminal offence to deprive a person of his rights, or to subject him to a discriminating punishment, would fail to reach a great number of cases which the broad and liberal provisions of the first section were intended to cover and protect. The clause in question is intended to reach these cases, or, at least, a large class of them. It provides a remedy where the State refuses to give one; where the mischief consists in inaction or refusal to act, or refusal to give requisite relief; whereas the second section provides for actual, positive invasion of rights. Thus, if the State should refuse to allow a freedmau to sue in its courts, thereby denying him judicial relief, or should fail to provide laws for the punishment of white persons guilty of criminal acts against his person or property, thereby denying him judicial redress, there can be no doubt that the case would come within the scope of the clause under consideration. Suppose that, in any State, *598 assault and battery, mayhem—nay, murder itself, could be perpetrated upon a colored man with impunity, no law being provided for punishing the offender, would not that be a case of denial of rights to the colored population of that State? Would not the clause of the civil rights bill now under consideration give jurisdiction to the United States courts in such a case ? Yet, if an indictment should be found in one of those courts against the offender, the technical parties to the record would only be the United States as plaintiff and the criminal as defendant. Nevertheless could it be said, with any truth or justice, that this would not be a cause affecting persons denied the rights secured to them by the first section of the law?
The case before us is just as clearly within the scope of the law as such a case would, be. I do not put it upon the ground that the witnesses of the murder, or some of them, are colored persons, disqualified by the laws of Kentucky to testify, but on the ground that the cause is one affecting the person murdered, as well as the whole class of persons to which she belonged. Had the case been simple assault and battery, the injured party would have been deprived of a right, enjoyed by every white citizen, of entering a complaint before a magistrate, or the grand jury, and of appearing as a witness on the trial of the offender. I say “ right,” for it is a right, an inestimable right, that of invoking the penalties of the law upon those who criminally or feloniously attack our persons or our property. Civil society has deprived us of the natural right of avenging ourselves, but it has preserved to us, all the more jealously, the right of bringing the offender to justice. By the common law of England the injured party was the actual prosecutor of criminal offences, although the proceeding was in the king’s name; but in felonies, which involved a forfeiture to the crown of the criminal’s property, it was also the duty of the .crown officers to superintend the prosecution. And, although in this country it is almost the universal practice to appoint public and official prosecutors in criminal cases, yet it is the right of the injured party, and a duty he owes to society, to *599 furnish what aid he can in bringing the offender to justice; and an important part of that right and duty consists in giving.evidence against him.
To deprive a whole class of the community of this right, to refuse their evidence and their sworn complaints, is to brand them with a badge of slavery; is to expose them to wanton insults and fiendish assaults; is to leave their lives, their families, and their property unprotected by law. It gives unrestricted license and impunity to vindictive outlaws and felons to rush upon these helpless people and kill and slay them at will, as was done in this case. To say that actions or prosecutions intended for the redress of such outrages are not “causes affecting the persons” who are the victims of them, is to take, it seems to me, a view of the law too narrow, too technical, and too forgetful of the liberal objects it had in view. If, in such a raid as I have supposed, a colored person is merely wounded or maimed, but is still capable of making complaint, and on appearing to do so, has the doors of justice shut in his face on the ground that he is a colored person, and cannot testify against a white citizen, it seems to me almost a stultification of the law to say that the case is not within its scope. Let us read it once more:. “The District Courts shall, concurrently with the Circuit Courts, have cognizance of all causes, civil and criminal, affecting persons who are denied or cannot enforce in the courts or judicial tribunals of the State or locality where they may be, any of the rights secured to them by the first section of this act.”
If the case above supposed is within the act (as it assuredly must be), does it cease to be so when the violence offered is so great as to deprive the victim of life? Such a construction would be a premium on murder. If mere violence offered to a colored person (who, by the law of Kentucky, was denied the privilege of complaint), gives the United States court jurisdiction, when such violence is short of being fatal, that jurisdiction cannot cease when death is the result. The reason for its existence is stronger than before. If it would have been a cause affecting him when living, it will *600 be a cause affecting him though dead. The object of prosecution and punishment is to prevent crime, as well as to vindicate public justice. The fear of it, the anticipation of it, stands between the assassin and his victim like a vindictive shade. It arrests his arm, and loosens the dagger from his grasp. Should not the colored man have the segis of this protection to guard his life, as well as to guard his limbs, or his property? Should he not enjoy it in equal degree with the white citizen ? In a large and just sense, can a prosecution for his murder affect him any less than a prosecution for an assault upon him ? He is interested in both alike. They are his protection against violence and wrong. At all events it cannot be denied that the entire class of persons under disability is affected by prosecutions for wrongs done to oneof their number, in which they are not permitted to testify in the State courts.
I am well aware of the case of Ortega, who was indicted in the Circuit Court for offering violence to the person of the Spanish minister. The defendant claimed that it was “a case affecting a public minister,” and under the Constitution cognizable only in the Supreme Court. But the court, taking the strict and technical view, decided that, being a criminal case, in which the United States was plaintiff and the offender was defendant, they only were the parties whom the case affected. . Conceding that this decision was good law for the purposes of that case, I do not feel that I am bound by it in this. The effect of that decision was, that the Constitution in giving the Supreme Court jurisdiction in cases affecting ambassadors, other public ministers and consuls, only intended to give these public persons the right to sue and be sued in the Supreme Court. In the case before us, I think Congress meant a great deal more than this when it gave the United States courts cognizance of all causes, civil and (criminal, affecting persons who are denied or cannot enforce in the courts of the State any of the rights secured by the first section of the act.
I have considered the case irrespective of the fact that the witnesses of the transaction were all colored people who, at *601 the time this indictment was found, were denied the right to testify against white persons in Kentucky. I have placed it on the sole ground, that prosecutions for crimes committed against colored persons, are causes which, in the sense of the civil rights bill, most seriously affect them; and that in Kentucky they were denied the privilege of being witnesses in these causes. I do not mean to be understood as saying that every cause in which a colored person may be called as a witness, for that reason belongs to the cognizance of the United States courts. In ordinary cases of a civil character, the party calling such a person as a witness is the person affected. Such party, be he black or white, may except to the rejection of his witness, and bring the case to this court by writ of error from the State court of last resort under the 25th section of the Judiciary Act. A defendant in a criminal prosecution may do the same thing where a bill of exceptions is allowed in criminal cases.
To conclude, I have no doubt of the power of Congress to pass the law now under consideration. Slavery, when it existed, extended its influence in every.direction, depressing and disfranchising the slave and his race in every possible way. Hence, in order to give full effect to the National will in abolishing slavery, it was necessary in some way to counteract these various disabilities and the effects flowing from them. Merely striking off the fetters of the slave, without removing the incidents and consequences of slavery, would hardly have been a boon to the colored race. Hence, also, the amendment abolishing slavery was supplemented by a clause giving Congress power to enforce it by appropriate legislation. No law was necessary to abolish slavery; the amendment did that. The power to enforce the amendment by appropriate legislation must be a power to do away with the incidents and consequences of slavery, and to instate the freedmen in the full enjoj'ment of that civil liberty and equality which the abolition of slavery meant.
In m3 opinion the judgment of the Circuit Court should be affirmed.